[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON CLAIMANT'S APPEAL
The claimant, Ann Secombe, brings this appeal from the Employment Security Board of Review's denial to her of unemployment compensation benefits following her termination as a limousine driver with Regency Limousine, Inc., of Wilton, Connecticut.
Claimant filed a claim for unemployment compensation benefits with the State of Connecticut's Employment Board, naming the limousine company as her former employer. An administrator heard the claim and ruled the claimant ineligible for unemployment benefits by a decision issued on April 13, 1988.
The claimant filed a timely appeal to a referee on April 15, 1988, pursuant to General Statutes, Sec. 31-241. The referee conducted a de novo hearing, made findings of fact and reversed the administrator's determination of ineligibility by a decision dated June 24, 1988. The employer appealed to the Board of Review on July 11, 1988. The Board modified the findings CT Page 8267 of the referee and reversed his decision, sustaining the employer's appeal on August 8, 1988. The claimant filed a motion to reopen the board's decision. The Board denied that motion on October 21, 1988. Claimant has now appealed to the Superior Court pursuant to General Statutes, Sec. 31-249b.
 I.
The Superior Court in hearing an unemployment-compensation appeal does not hear the case de novo. The function of the court is to sit as an appellate court in reviewing the record certified by the Board of Review. United Parcel Service, Inc. v. Administrator, 209 Conn. 381, 385, A.2d (1988); Finkenstein v. Administrator, 192 Conn. 104, 112, 470 A.2d 1196 (1984). The court does not retry the facts or hear evidence. United Parcel Service, In. v. Administrator, supra. The court is bound by the findings of fact and reasonable conclusions of the Board in determining whether the Board's decision is arbitrary, unreasonable or illegal. The legal conclusions of the board must stand if they result from a correct application of the law to the findings of fact and could reasonably follow from those findings. Robinson v. Unemployment Board of review,181 Conn. 1, 4, 432 A.2d 293 (1980); Guevara v. Administrator,172 Conn. 492, 495, 374 A.2d 1101 (1977). The court may not substitute its conclusions for those of the Board. Johnson v. Administrator, 3 Conn. App. 264, 267, 487 A.2d 565 (1985).
The issue in this case is whether the claimant was properly disqualified from receiving unemployment benefits for having voluntarily left suitable employment without sufficient cause in accordance with C.G.S. 31-236(1)(2)(A). That statute provides, as pertinent here, that:
 An individual shall be ineligible for benefits (20)(A) if, in the opinion of the administrator, he has left suitable work voluntarily and without sufficient cause connected with his work, until such individual has earned at least ten time his benefit rate, . . . provided further no individual shall be ineligible for benefits if he leaves suitable work (i) for sufficient cause connected with his work, including leaving as a result of changes in conditions created by his employer . . .
 II.
The appeals referee made, inter alia, the following findings and conclusions:
3. Age 31, the claimant was a full time limousine CT Page 8268 driver for an eight month period ending in voluntary termination on March 20, 1988. She was paid by way of commission and tips.
 4. The claimant voluntarily terminated her employment on the basis that the conditions of her employment had been changed by the employer, and that she was being assigned work schedules that were excessive. She also had the prospect of other work at the time of her separation.
 5. The claimant was initially hired by the dispatcher Neal Lynn. The claimant understood that she would be assigned to the evening shift (1 or 2 p. m. to approximately Midnight), and that she would work five days per week.
 6. Newly hired drivers are generally assigned to the evening shift and are later provided first shift assignments as they become available.
 7. The claimant had no complaints about her assignments during the earlier months of her employment. She was routinely assigned shifts during the afternoon and evening hours.
 8. The claimant's work assignments gradually changed, particularly during the final months of her employment. She was repeatedly asked to call in on her days off to accept available work, and she was repeatedly assigned trips during morning hours, in addition to her normal schedule of trips during afternoon and evening hours.
 9. Dispatchers frequently called the claimant's home during late evening hours, before she had returned from her current assignment, to assign trips for the early morning hours of the next day. This occasionally resulted in the claimant's beginning her work day at approximately 5 a.m., only to finish her final trip after Midnight the next morning.
 10. The claimant repeatedly advised the dispatchers that she was dissatisfied with her assignments and, that she was becoming too weary. However, the dispatchers indicated that her services were needed and the claimant attempted to comply.
 11. The claimant ultimately determined that she could not continue the pace and that the situation was CT Page 8269 becoming dangerous. The claimant had the prospect of another job at the time of her separation on March 20, 1988, but that second job failed to materialize and she filed the present claim as a result.
Decision: . . . .
 It is acknowledged that due to the nature of its business, the employer has difficulty scheduling its drivers far in advance, and that drivers spend a good deal of time "standing by', which might afford them time to rest. However, the evidence and testimony attendant to this case provides that the claimant's work assignments gradually changed from the conditions she understood would exist at the time of her hire. The conditions changed in such manner that the claimant was eventually assigned to work what might be considered double shifts. For example, the claimant might be called upon to perform a morning trip at 5 or 6 a.m., several mid to late-afternoon trips, and late evening trips that would not see her return to home until the early morning hours of the next day. While it might be argued that stand-by time between trips afforded an opportunity for rest, those periods would not provide ample opportunity for quality rest.
 The evidence and testimony further revealed that the claimant repeatedly advised the dispatchers that she was dissatisfied with her assignments and, on occasion, that she felt too tired. She was repeatedly asked to comply because her services were needed, and she attempted to do so. However, she determined that the resulting "lifestyle" was not acceptable and went in search of another job.
 It seems clear that the company's president was not aware of the particular circumstances of the claimant's complaint, and would likely have disapproved of the work schedule assigned to her. However, dispatchers are assigned with the authority to assign trips and to act on complaint of fatigue by drivers. The available testimony indicates that they repeatedly failed to do so. The claimant did not personally acquaint the company president with her grievance before leaving, presumably because she felt it would do no good or because, at the time, she thought she had another job.
CT Page 8270
The referee concludes that the employer had changed the conditions of employment in such manner as to render the claimant's position unsuitable and to provide the claimant sufficient cause to sever. Accordingly, the Administrator's determination is reversed, and the claimant's appeal is sustained."
In its decision, the Board of Review stated:
 "Acting under authority contained in Section 31-249 of the Connecticut General Statutes, the Board of Review has reviewed the record in this appeal, including the tape recording of the Referee's hearing.
 The Referee ruled that the claimant voluntarily left her employment with sufficient cause and thus was not disqualified from the receipt of unemployment compensation benefits. The Referee's decision was based on his conclusion that the job had become unsuitable because the claimant was required to work excessive hours.
 The record establishes that the claimant, a limousine driver, was originally hired for night shift work; that she was increasingly asked by the dispatchers to take daytime assignments in addition to her regular assignment; and that, on occasion, she worked extended periods without adequate rest. The claimant complained to the dispatchers about being fatigued but, apparently, never refused an assignment. The claimant regularly saw the company president, but she never complained to him or informed him of her difficulties with the dispatchers. Had the president been aware of the claimant problems, he would have taken steps to correct them. Specifically, he would have restricted the claimant's assignments to the night shift and he would have demanded that the dispatchers comply with a company rule which relieves from duty any driver who complains of fatigue.
 Although we have some question about the actual motive for the claimant's resignation, we accept the Referee's conclusion that the employer had changed the conditions of the claimant's employment and that the claimant's job had become unsuitable. However, it is axiomatic that a claimant contemplating a quit due to unsuitable working conditions must inform the employer of her grievances and must afford the employer a reasonable opportunity to remedy the situation. [Citations omitted]. The claimant's objections to the CT Page 8271 dispatchers were not compliance with this requirement. Although the dispatchers controlled the claimant while she was driving, they were not part of management. Rather, they were co-workers whose jobs required them to assign drivers as needed. It is not surprising that their performance of their duties might cause the claimant to feel pressured and they would not pay heed to her complaints. That is precisely why the claimant should have complained to the president or some other appropriate management employee. See, Clason v. Omega Engineering, Board Case No. 2948-82-BR (3/21/83). Because the claimant failed to do so, we cannot find that she had sufficient cause for leaving when she did.
 Accordingly, the Referee's decision is reversed, and the employer's appeal is sustained. In so doing, we modify the Referee's findings of fact in accordance with the foregoing."
 III.
It is the claimant's position that General Statutes, Sec.31-249 mandates that when the Board modifies the referee's findings of facts or conclusions of law, it "shall include its findings of facts and conclusions of law" in its decision. (Emphasis added). The claimant asserts that the Board failed to comply with this legislative mandate, in toto, when it rendered its August 8, 1988 decision in this matter.
The claimant further asserts that the Board concluded, without making any findings in support thereof, that the claimant's repeated objections to Regency's dispatchers about her work assignments did not constitute sufficient notice to Regency to afford it an opportunity to remedy the situation because the dispatchers "are not part of management."
Likewise, the Board did not state whether or not its decision "was based on the record of the hearing before the referee" in further violation of the mandate of General Statutes, Sec. 31-249. Hence, it is impossible to determine upon what basis the Board reached its pivotal conclusion that the dispatchers are not "part of management." This omission is aggravated by the fact that the Board did not address the referee's express finding that the dispatchers "are charged with the authority to . . . act on complaints" of Regency drivers.
Accordingly, the claimant asserts that the Board acted unreasonably, arbitrarily and illegally as a matter of law and its decision must be reversed. CT Page 8272
The claimant also asserts that the Board's conclusion that the claimant's repeated complaints to Regency dispatchers did not constitute notice to Regency of her objections to work assignments is not legally or logically supported by the record. The referee found and the Board did not modify the findings that the claimant was "hired" by a dispatcher; the dispatchers called the claimant at her home and assigned her trips; and, the dispatchers "controlled" the claimant while she was driving.
Moreover, the claimant asserts she had no reason to believe that her complaint to the dispatchers would not be acted upon, since the Referee found that the dispatchers were charged with the authority to act on such complaints. The claimant alleges that the Board's decision provides no factual basis for believing otherwise.
Finally, the claimant asserts it is axiomatic that the law does not require the performance of a futile act as a condition precedent to the enjoyment of a right or benefit to which a claimant is otherwise entitled. Auger v. Administrator,19 Conn. Sup. 184, 187 (1954). The claimant did not raise her complaints directly with Regency's president upon terminating because she believed that she had another job at the time; she felt that her problem had become moot.
To insist upon the claimant raising her complaints with Regency's president, after she had already repeatedly complained to those company employees charged with the authority to resolve complaints about working conditions, is only to require her to perform a futile act as a condition precedent to her receipt of unemployment compensation benefits in contradiction of a fundamental precept of law long recognized in this state. The plaintiff asserts that support for this position can be found in Patz v. Abdows Big Boy Restaurant-Abdow Corp., 322-80-BR (June 5, 1980)(where, prior to quitting, claimant did not request the employer to change his job assignment to one which would alleviate his complaints is not ground for denying unemployment benefits since it was unlikely that such a request would or could have been granted).
 IV.
Contrary to the claimant's assertions, however, the Board did make factual findings and asserted that the findings were based on a "review of the record, including the tape recording of the referee's hearing."
The Board found that "the plaintiff regularly saw the company president, but she never complained to him or informed CT Page 8273 him of her difficulty with the dispatchers. Had the president been aware of the claimant's problems, he would have taken steps to correct them. Specifically, he would have restricted the claimant's assignments to the night shift and he would have demanded that the dispatcher's comply with a company rule which relieves from duty any driver who complains of fatigue."
The claimant made no motion to correct this finding nor made any claim that there was no evidence before the referee to support such finding. Indeed, the referee himself found that: "It seems clear that the company's president was not aware of the particular circumstances of the claimant's complaint, and would likely have disapproved of the work schedule assigned to her. . . .The claimant did not personally acquaint the company president with her grievance before leaving, presumably because she felt it would do no good or because, at the time, she thought she had another job." Thus, both the Board and the referee found that also the president had been informed by the claimant of her grievances, he would have addressed them.
Insofar as the referee's conclusion that the dispatchers are charged with the authority to assign trips and to act on complaints of fatigue by drivers can be read to relieve the claimant of the responsibility of informing the employer of her complaints and to give the employer the opportunity to remedy the problem, the board did modify the referee's findings.
However, while finding that the employer had changed the conditions of employment in such a manner as to render the claimant's position unsuitable (a finding adopted by the Board), the referee also specifically found that the president was not informed of her grievance and would not have approved of the schedule imposed on her by the dispatchers.
The claimant's assertion that this would have been futile is contradicted implicitly by the Referee's findings and explicitly by the Board's findings.
The principal difference between the Referee's conclusions and the Board's conclusions is this. The Referee implied, without specifically concluding, that complaints to the dispatchers was sufficient to meet the requirement that a claimant has the responsibility of informing the employer of the complaints and give the employer the opportunity to remedy the problem. The Board determined that in the circumstances of this company, the evidence indicated that dispatchers were co-workers who assigned drivers as needed, but the claimant knew and regularly saw the company president and it was he who should have been informed of the complaints against the dispatchers' assignments and should have been given an opportunity to remedy the CT Page 8274 situation.
The court has examined the authorities presented by the defendant that sufficient cause for leaving employment is not established under C.G.S. 31-236(a)(2)(A) unless the claimant informs the employer of his complaints and gives the employer an opportunity to remedy the problem. Regs. Conn. Agencies Sec.31-236-22(a)(2); Bolden v. Administrator, 40 Conn. Sup. 208,211, 485 A.2d 1379 (1984); Schwartz v. Administrator, No. 0077938 S, Superior court, J/D Stamford/Norwalk, Bingham, J., June 13, 1986; Graton v. Administrator, No. 212544, Superior Court, JD of New Haven, Reynolds, J., March 29, 1984; Bimmler v. Administrator, No. 049721, Superior Court, JD of Waterbury, Glass, J., April 27, 1981. These support the validity of this condition as a requirement under the statute.
Because the claimant has not contradicted that there was testimony by the company president before the referee as to the limited role of the dispatchers who were co-workers rather than part of the management and has not moved to correct any finding based on this testimony, the court must find that complaints to the dispatchers did not satisfy the requirement that claimant raise her objections with the employer before voluntarily leaving employment. The Board specifically found that the employer would have taken appropriate corrective action if claimant had informed him of her difficulties and the referee's findings were not contrary. Claimant's failure to discuss her objections to the changes in the conditions of her employment denied the employer an opportunity to remedy the situation.
Since plaintiff did not explore reasonable alternatives to leaving her employment, the board properly determined that she was disqualified from receiving benefits pursuant to C.G.S.31-236(a)(2)(A).
This court cannot find that the Board's determination is arbitrary, unreasonable or illegal.
NIGRO, J.